# Richmond

## MARTIN MOON, ET ALS., ETC. V. VIRGINIA NORVELL, ET ALS., ETC.

January 14, 1946.

Record No. 2986.

Present, All the Justices.

The opinion states the case.

*J. H. Rives, Jr.,* and *Ellsworth Wiltshire,* for the plaintiffs in error.

*Louis S. Herrink* and *J. Kenneth Rader,* for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

The beneficiaries named in a typewritten will, dated December 15, 1942, duly executed by Harriet N. Moon

and properly attested, prosecute this writ of error to an order admitting a pencil writing, dated February 24, 1944, to probate as the last will and testament of the testatrix.

The dominant question presented is whether the will of February 24, 1944, is "wholly in the handwriting" of the testatrix.

Harriet Norvell, one of the former owners of famous Elk Island on the upper James, after her marriage to J. Luther Moon, took an active part in the religious and social welfare, as well as the financial activity, of Richmond. She was well educated and intelligent. She was chairman of the Board of Trustees of the Crippled Children's Hospital for several years, and served at various times on the boards of other charitable and religious organizations. She owned in her own right an estate valued at more than $125,000. On April 5, 1933, she duly executed a typewritten will in which she made a number of bequests to relatives and charitable institutions, gave the remainder of her estate to her husband in fee, and named him and the Bank of Commerce and Trusts of Richmond executors of her estate. This will, evidently prepared by an experienced scrivener, was properly executed in the presence of three witnesses. On December 15, 1942, she duly executed another will, consisting of four typewritten pages, prepared by Miss Elizabeth N. Tompkins, an able practicing lawyer of the Richmond bar. This will expressly revoked all previous wills and transferred her entire estate into a trust for the benefit of her husband, J. Luther Moon, who, in the meantime, had become *non compos mentis*. On the death of the husband, the trust estate was directed to be distributed to certain named beneficiaries. Elizabeth N. Tompkins was named the sole executor and trustee. Unless this will was revoked or superseded by the pencil writing of February 24, 1944, it was the last will and testament of the testatrix.

Mrs. Moon became dissatisfied with this will and, in November, 1943, indicated to an officer of the Bank of Commerce and Trusts, the committee for her husband, that she expected to change her will. One reason for her dis-

satisfaction was that the will of 1942 named only one executor, whereas she desired two executors to administer on her estate. Some time after this conversation, a member of the household called Mrs. Moon's attention to some old papers, and asked her to examine them and see if they were of any value. Among these papers Mrs. Moon found her old will, executed in April, 1933. On the reverse side of the pages of this old will, the testatrix wrote with a pencil another will, dated February 24, 1944, which the trial court admitted to probate. This will reads as follows:

"I wish my estate to be used for the care of my husband J. Luther Moon provided his estate does not give him all comforts and care that he shall need. I also wish him to keep his car as long as my estate is able to pay for same.

"After his death I wish the following benefits be paid To my niece Virginia Norvell Red Bluff California all the Commerce & Trust Bank stock. If this has been sold then I wish to give her $25,000 in cash or bonds and stock to that amount. To John Norvell my nephew the sum of $1000 in cash or the equivalent. To my cousin Lily Patterson Ransoms Buckingham Co. Va. $1000. Also my clothing if she should want them. To Kathleen Edwards my share of the What not Antique Shop. To Hazle Cellars my little round antique table. To Helen Hicklin any of my milk glass she shall want. To my friend Sarah Bentley $500.00 To Helen Moon $10,000 in cash or equivalent. After all the above bequests have been made I wish all the rest of my estate to go directly to my niece Virginia Norvell. I also wish her to have any or all of my antiques she may wish.

"I hereby appoint the Bank of Commerce and Trusts and Elizabeth Tompkins my executors of my last will and testament.

"Feb. 24, 1944                    Harriet Norvell Moon."

Appellants contend that the pencil writing on the back of each of the three typewritten pages of the 1933 will was not

all of the will of February 24, 1944, but that the introductory paragraph and Article I of this old will were undeleted and were a part and parcel of the holograph instrument. These paragraphs read as follows:

"I, HARRIET NORVELL MOON, wife of J. Luther Moon, of the City of Richmond, Virginia, do make, publish and declare this to be my last will and testament, and do hereby revoke all wills at any time heretofore made by me.

## "ARTICLE I

"My will is that all of my just debts and funeral expenses shall be paid out of my estate as soon after my decease as shall be found convenient."

The grounds of appellants' contention, that the testatrix intended the two typewritten paragraphs to be a part of her will of February 24, 1944, may be summarized as follows:

(1) The appearance of the manuscript cover and the three legal size sheets containing the pencil writing;

(2) The two paragraphs in question were not deleted, while all other substantial parts of the old will were deleted by pencil marks;

(3) The absence of any introductory paragraph or provision for the payment of funeral expenses and debts in the pencil writing;

(4) The place of commencement of the handwriting on the back of the first page; and

(5) The use of the pages of the old will as the media for the new will.

The will of 1933 was typewritten on three sheets of legal size paper fastened to a blue manuscript cover. When the papers are folded in the usual manner, the following descriptive words appear on the front of the cover:

> "*WILL OF*
> "*HARRIET NORVELL MOON*
>
> "This will
> "Made Feb. 24
> "1944
> "My last will."

The italicized words above were written with a typewriter; the other words were written by the testatrix with a pencil.

On the face of these pages, when unfolded, appears the entire typewritten will of April 5, 1933, consisting of an introductory paragraph, eight other paragraphs designated Articles I through VIII, and the attesting clause. The words, "Article I," "Article II," etc., were written on separate lines between the paragraphs. The introductory paragraph and Article I, containing the provision for the payment of funeral expenses and debts, were undeleted. The two lines composing Article II were deleted by horizontal pencil lines. Articles III, IV, V, VI and VII, and the attesting clause were deleted by large diagonal X or cross marks in pencil. Article VIII was deleted by a single diagonal pencil mark. The testatrix signed her name at the bottom of pages one and two and at the conclusion of the will near the top of page three. Below her final signature and to the left on page three was the attesting clause followed by the signatures of three witnesses.

Two metal clasps fastened the typewritten sheets to the manuscript cover and were inserted near the top of the pages so that, in reading the typewritten pages, each page would have to be turned from bottom to top. Thus testatrix seems to have turned the pages of the old will. She began writing her will of February 24, 1944, close to the top of the first turned page and continued to write to within one inch of the bottom of it. Then she turned page two and began to write close to the top of this page and continued to write down to little more than half an inch of the bottom. Likewise she turned page three and began to write close to the

top of it and concluded her writing near the center of this page with her signature and the date.

One reading the descriptive words on the folded manuscript cover would expect, on unfolding the document, to find a completed will and nothing else. As stated, this was not the case. On February 25, the day after the date appearing on the pencil writing, the testatrix handed the folded instrument to Mrs. Elizabeth P. Thomas, who had lived as nurse in the home of testatrix for two years. On unfolding it, Mrs. Thomas saw the typewriting and the pencil marks across the pages. This witness asked the testatrix the meaning of these marks and was told: "I have marked something out there; just an old will I didn't know was in existence, but what I wanted you to read is on the back." The trial court, following the directions given Mrs. Thomas by the testatrix and examining the back of each page, found a completed will disposing of the entire estate of the testatrix. Executors were named therein, the date was affixed and the will signed. Every part of this writing on the backs of the pages was written by the testatrix.

Appellants contend that testatrix' expression, "I have marked something out there," coupled with the fact that no marks of deletion were drawn through the introductory paragraph and the provisions for the payment of funeral expenses and debts, is indicative of testatrix' intention to include these two undeleted paragraphs in her will of February 24, 1944. This contention takes out of the setting and unduly emphasizes the first sentence, which is more or less a brief explanation. If the whole statement is considered, as it must be, the important matter is in the last sentence—"What I wanted you to read is on the back." The first two sentences are purely explanatory. The first sentence is directed to the pencil marks. The second sentence is descriptive of the typewritten matter. The last sentence focuses attention upon what the speaker evidently regarded as vital.

This conclusion becomes more apparent when the testimony of Miss Sarah Bentley, another member of the household and a close personal friend of the testatrix, is

considered. Miss Bentley said that during Mrs. Moon's sickness papers had been moved from one place to another and that she saw some business papers in the top of an old desk. She asked Mrs. Moon to look over these papers "because there might be something of importance and they are liable to get lost back there and scattered around." A few days thereafter Mrs. Moon passed her door going through the hall and remarked to her: "I didn't see anything of importance back there, but I did find something I didn't know I had or was in existence. * * * It is an old will." Mrs. Moon knew that she had executed a will on December 15, 1942, which revoked all prior wills and, in her reference to this will of 1933, she described it as nothing of importance, "just an old will I didn't know was in existence." No defacement or deletions were necessary to kill a dead instrument. In order to breathe life into a dead thing, something more is necessary than failure to draw horizontal lines or make cross marks over the typewritten matter.

■ ■ Code of 1919, sec. 5229, requires that a will be attested "unless it be wholly in the handwriting of the testator." The purpose of the statute, in prescribing formalities for the execution of wills, is to prevent mistakes, imposition, fraud or deception. "The ceremonies required by this law, were not intended to restrain or abridge the power of testators, but to guard and protect them in the exercise of that power; and in that spirit (as I think) should the law be administered." *Boyd* v. *Cook*, 3 Leigh (30 Va.) 32, 50.

■ The holograph instrument disposes of the entire estate of the testatrix, names the parties and the amount of property she desired each to receive. There is no uncertainty as to her dispositive intentions. It is quite true that this pencil writing does not contain an introductory paragraph and does not provide for the payment of debts, as did the two former wills of the testatrix. While such paragraphs are usually found in wills prepared by those who have had more or less experience in writing such legal instruments, neither is necessary. The express intention of a testator that he is about to make the last and final disposition of his property is

usually set forth in the beginning or in the introductory paragraph. If the testamentary intention may be determined from other parts of the will, the formal expression of such intention is not essential and is frequently omitted when testamentary instruments are prepared by unskilled persons.

■ When a will contains no specific direction for the payment of funeral expenses and debts, the provisions of Code of 1919, sec. 5390, control. See *Edwards* v. *Cuthbert, ante,* p. 502, 36 S. E. (2d) 1. No specific direction for the payment of these obligations was made in any of the three wills executed by testatrix.

Appellants indulge in speculations as to why the testatrix failed to delete the two paragraphs, why she used pages of the old draft as the media for her new will, why the testatrix did not unfasten the clasps holding the papers together, why she began writing so close to the top of the pages, and why she failed to leave indentures on the left hand side of the pages denoting paragraphs. All of these suggestions are in the realm of speculation and fancy. The most that can be said of this type of argument is that it creates some mental uncertainty as to the intentions of the testatrix in this regard.

■■ If the testatrix did intend for the two paragraphs to be a part of her will of February 24, 1944, then she has attempted to do an unlawful thing. "In the construction of wills the object is not to seek flaws and declare them invalid, but to sustain them if legally possible, and the presumption is that the testator intended a lawful rather than an unlawful thing. Therefore, where the language used in the will is reasonably susceptible of two different constructions, one of which will defeat, and the other sustain the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it." *Triplett* v. *Trotter,* 169 Va. 440, 445, 193 S. E. 514; 28 R. C. L., pp. 206, 207.

"The mere presence of printed matter upon stationery used by a person for the purpose of writing his holographic will, which forms no part of the written instrument, and to

which no reference directly or indirectly is made in the written instrument, will not destroy the effect of such instrument as an holographic will." *In re De Caccia's Estate*, 205 Cal. 719, 273 P. 552, 61 A. L. R. 393, 398.

The Honorable Brockenbrough Lamb, the experienced and learned trial judge, has so aptly stated his reasons for rejecting the contentions of appellants that we adopt the following part of his opinion as our own:

"The foregoing five points are thought to cover the whole substance of the contention of the opponents as presented with earnestness and ability by counsel for the opponents.

"It comes down to this: The Court is asked to draw an inference of intent that would destroy a holograph will otherwise complete and probatable; and to draw this inference from the negative fact that she did not delete these typewritten words on the other side of the sheet on which her manuscript began, coupled with vague and uncertain deductions—from 'juxtaposition', customs of spacing written words, equivocal comment and emphasis in a casual spoken word, and a presumed density of ignorance as to the essentials of a valid will which is not justified by the testimony—that is, in fact, contrary to the testimony as well as the internal evidence afforded by the handwriting and the language of the document itself.

"This court of probate declines to draw such an inference from facts and circumstances so inconclusive.

"In searching for the intent of the testatrix, whether to include or not to include the typewritten words as an integral part of her will in its final form, we should place over against the five points of the opponent the following *indicia* that she did not so intend:

"1. The manuscript is not interwoven with the typewriting, nor does it follow immediately after it. On the contrary, all the manuscript is on the other side of the paper.

"2. There is no reference placed after the typewriting to the manuscript. It would have been natural, almost irresistible, to insert after the typewritten 'Article II' a catch phrase, such as 'see over' or 'continued on other side.'

"3.  There is no reference at the beginning, or anywhere else in the manuscript, to the typewriting on the other side. Again, how natural to begin by writing 'Article II' or 'continuing after Article I on the other side.'

"4.  As the paper does not, either in physical form or by reference, even suggest that the manuscript is a continuance of anything from the other side or elsewhere, so the phraseology equally lacks any such suggestion.  If it is intended to follow the typewriting as a part thereof, we would expect (especially in view of the physical separation) some beginning such as 'And then', or 'After this is done', or 'next I wish',—or 'I wish the rest of my estate'—or any one of a dozen such phrases indicating continuation.  They are conspicuously absent.

"5.  And not only do physical form, lack of reference and phraseology fail to support the inference; the sense of the opening clause of the manuscript carries a suggestion that it does not in thought sequence continue on from the typewriting,—and this suggestion, though slight it is true, is positive in character.  The typewriting directs debts, &c., to be paid 'out of my estate.'  The manuscript begins, 'I wish my estate to be used for the care of my husband.' Would it be natural for this intelligent woman, if she had just read and considered Article I and intended to let that stand as part of her will, to proceed immediately without qualification to devote that estate '(implying the whole of it) to other uses?  If it be said in reply that the word 'estate' is used in two senses in these two passages, as gross estate in the typewriting and as net estate in the manuscript, then the break in the flow of the thought is all the more striking.

"6.  And the form and phraseology of the manuscript is wholly different from those of the old typewritten will; they could hardly be more dissimilar.

"This testatrix was one of the rapid and ready writers of her generation; a writer with that confidence in the ability of her correspondents to 'read writing' that is astonishing to a generation nurtured on the typewriter,—and actually taught to print with pen or pencil, in imitation of that prolific

mechanical mother of words. This testator did not write after the manner of a precisionist; nor did she delete with meticulous care, laboring under the anxiety of being misunderstood.

"So far from following a form, slavishly and fearfully, as the opponents of this will contend, she utterly and totally abandoned that form, though she had it under her hand, on the other side of the paper. No 'articles' for her; on the contrary, just the most delicate hint of indentation, if indeed any, to denote her paragraphs. The manuscript starts out boldly with the simple statement of her prime consideration as to the use of her estate—the comfort and welfare of her unfortunate husband; and it continues simply and boldly with her secondary and subordinate 'benefits.' No 'give, devise and bequeath' for her—not one, though the form she is said to be too timid to depart from at the outset is replete with such proper legal expressions. No 'rest, residue and remainder of my estate', but merely 'all the rest of my estate.' No 'do constitute and appoint' my executor, 'requesting that no bond, &c.'; no thought of the 'approved' form here, but a simple 'appoint' followed by the names of the bank and the individual.

"These reflections and considerations point positively and strongly to the conclusion that this testatrix not only did not intend any part of the old typewritten will to be embodied into her manuscript 'last will', but that she did not have the old will at all in mind when she set out, boldly and independently, to state with her own hand, simply and forthrightly, her testamentary wishes and dispositions. If she had had it in mind, or if she had read it immediately before she wrote, it would seem that she could hardly have departed in such a radical manner from every semblance of similarity in form and have adopted such an utterly different turn of every phrase.

"The opponents of this holograph will invite the court to draw an inference from a negative—the failure to delete certain words on the other side of the sheet. This is considered by the Court to be not inference but speculation.

And if the Court were to accept the invitation to speculate it would rather suppose it more likely, on the whole, that there was a substantial interval of time—hours, days or perhaps weeks—between the deletions and the writing of the will on February 24, 1944, than that the writing followed immediately after the deletions and as a continuation of the undeleted introduction and Article I. It may well be that the deletions were begun with the idea that what was left could be turned over to a draftsman of a new formal will, to be followed; but that this idea was wholly abandoned when it was seen how radical the desired changes were,—and the bold purpose formed to make her own will in her own way; and that the old will—the whole of it—was thereupon abandoned and perhaps forgotten, except for the clean paper the backs of the sheets furnished ready to hand."

The order is affirmed.

*Affirmed.*