# Richmond

CHRISTINA BELL v. MARY H. TIMMINS, ADMINISTRATRIX OF
MARY HALIHAN GILROY, DECEASED, AND OTHERS.

March 13, 1950.

The opinion states the case.

*Charles R. Moss, Wilbur G. Mitchell* and *George W. Reilly*, for the petitioner.

PER CURIAM.

Appellant contends that the Chancellor committed reversible error in permitting an alleged holograph will of Mary Halihan Gilroy to be probated, because some of the words in the paper writing were conceded to have been written by another.

The will, with the words not written by the testatrix on separate lines and in parentheses, is as follows:

"I Mary Halihan Gilroy of Richmond Virginia do make Publish and declare this to be my last Will and testament

and do hereby revoke all other Wills by me at any time
(I)      (I possess in equal Shares)
heretofore made i leave all / to John Gilroy in equal Shares
(the)        (of my deceased husband, John Gilroy)
to his / nieces and nephews / who are living at the time of
(ten)
my death to Michal Gilroy a brothe 10 oo Dollars and a
(ten)   (all are residents of)  (County)
Sister Annie Kivlehan 10 oo Dollars / Drumcliffe Co / Sligo
Ireland and ten Dollars 10.oo to  Christina Bell
88 New st. Newark N. J
two hundred Dollars 200.oo to little Sisters Poor of
Richmond

Mary Halihan Gilroy"
(Seal)

The learned Chancellor deleted the words which were not in the handwriting of the testatrix and the paper writing so deleted was probated.

The pertinent facts are so concisely stated in the opinion of the Chancellor, and his reasoning is so logical and convincing, that we have decided to refuse the appeal and to adopt and publish his opinion as the opinion of this Court, which is as follows:

"On June 2, 1949, a manuscript paper dated November 24, 1935, purporting to be a holograph will of Mary Halihan Gilroy was presented to the court on behalf of Patrick Gilroy, one of the chief beneficiaries, and offered for probate. At that time Christina Bell, a niece and sole next of kin and heir at law of Mary Halihan Gilroy, appeared in her proper person as well as by counsel, and made herself a party to the proceeding, entering her objection as contestant to the probate of the will.

"The proceeding from that point was, as to the parties thus before the court, an *inter partes* probate matter. The issue of devisavit vel non was informally framed at the bar,

all questions of law and fact being submitted for determination by the court without a jury.

"The position of contestant was that certain of the writing on the paper was by another hand,—that it was not a valid will for the reason that it was not wholly in the handwriting of Mary Halihan Gilroy. The paper is written with pencil on one side of a single sheet of paper. It is by no means easy upon casual inspection to determine whether all of it is by the same hand.

"Further hearing of the matter was fixed for June 29, 1949, it being arranged that in the meantime H. E. Cassidy, the well known and highly accomplished examiner of questioned documents, would make a study of the paper and give the court the benefit of his expert opinion in the form of testimony.

"On June 29, 1949, the evidence in the case on behalf of the proponent and on behalf of the contestant was heard. Mr. Cassidy appeared and testified, giving the results of his study in the form of a comprehensive written report, which by stipulation is taken and considered as his evidence in chief; it is filed marked 'Exhibit Cassidy 6/29/49.' It was clear from the testimony of Mr. Cassidy that certain words, punctuation marks, deletions and other changes in the paper were not in Mary Halihan Gilroy's handwriting. It was equally clear that there was no attempt at concealment or forgery, and Mr. Cassidy voiced a well grounded suspicion that some friend, with good intentions but quite unfamiliar with legal affairs, had at some time after the document was written by Mrs. Gilroy undertaken to polish and improve it. At this juncture all participating in the trial became interested in who this well wishing friend might be. Mr. Cassidy ventured a guess that it was probably one Agnes O'Brien, and counsel for the proponent said that a like suspicion had occurred to him while Mr. Cassidy was testifying, adding that to the best of his knowledge Miss O'Brien was in Florida. My one of those strange accidents it was discovered that Miss O'Brien had, either purposely or by

chance, come to Richmond and was in the City at that time. A forthwith witness subpoena was issued and she was brought to the witness stand. Her testimony was taken and reduced to writing by a court reporter.

"Miss O'Brien said that she was a close friend of Mary Halihan Gilroy, perhaps the closest friend she had; that about three years ago the matter of Mrs. Gilroy's making a will came up and she expressed a desire for assistance,— and this Miss O'Brien cheerfully offered. Mrs. Gilroy came to see Miss O'Brien on this business, bringing with her in a paper bag the paper dated November 24, 1935, and other papers, and in Mrs. Gilroy's presence and with her consent Miss O'Brien undertook to make certain alterations and deletions on the paper for the purpose, and only for the purpose, of clarifying it as respects punctuation, grammar and phraseology. It was Mrs. Gilroy's fixed intention to make a will to this same purport; but not being herself a ready writer she wanted Miss O'Brien to help her as to form. She was insistent, however, that she herself wished to make the will and not have it made for her. Then and there Miss O'Brien took a pencil and made the numerous alterations which are meticulously enumerated in Mr. Cassidy's report, pages 6 and 7.

"I do not deem it necessary for me to discuss in detail these changes. They become glaringly apparent upon the inspection of the paper itself with Cassidy's report in hand. It is an important point in this case,—that none of these changes, nor all of them put together, make, or were intended to make, the slightest change in the meaning of the document. They were simply, in the view of Miss O'Brien, 'improvements and clarifications' in capitalization, punctuation and phraseology.

"Miss O'Brien went on to testify that Mrs. Gilroy then left with the purpose of making a copy of what Miss O'Brien had framed for her, to be wholly in Mrs. Gilroy's handwriting and signed by her. Miss O'Brien further testified that shortly thereafter, a matter of a week or so, Mrs.

Gilroy came back and exhibited to her another and new will wholly written by her, dated and signed, which will at the outset contained a general clause of revocation and then made the identical disposition of her property, there being, however, inserted some of the given names, but not the surnames, of the nieces and nephews to whom the bulk of the property was given. Miss O'Brien added that Mrs. Gilroy had not seen fit to include certain charitable gifts Miss O'Brien had suggested.

"What the court is to do with the testimony of Miss O'Brien and how far it is to be accepted in these proceedings will be a matter of later comment. It is interesting to note at this point that the case does not depend on witnesses to handwriting, lay or expert. The document examiner with his careful study and experience was able to render, by a fortuitous set of circumstances, a greater service than experts are usually able to render. He was not only able to give his opinion as to precisely what words, letters, lines and punctuation marks were in a different hand, but through him the court was able to find the hand that actually wrote those characters. As the case has thus developed it does not depend upon opinion evidence but upon the application of law to known facts. Mary Halihan Gilroy had for eleven years a holograph will that was undoubtedly valid; it was quite good and clear until improved and embellished by her perfectionist friend. The question is how to apply correct principles of law to this almost unique set of facts.

"In order now to connect up I should state that Mrs. Gilroy was when she was over sixty years of age left the childless widow of John Gilroy. Her husband died in January, 1934, nearly two years before the date of the will in question. He had caused an elaborate will to be prepared by a lawyer but it had never been executed, and he died intestate. His widow, Mary Halihan Gilroy, would have received his entire estate as his sole distributee, but it so happened that all that they had, an estate of some $18,000.00, was in the form of joint bank accounts passing to the sur-

vivor, and bonds similarly registered, so that it was in her capacity as survivor that she came into all the property. She wrote the paper in question nearly two years after his death,— and then for eleven years she had a perfectly good holograph will, carrying out in general his wishes as expressed in his unexecuted will. The exact phraseology of this good holograph will is set out in the middle of page 5 of the Cassidy report. Then, some three years ago, Mrs. Gilroy had the misfortune to consult a well intentioned but misguided friend.

"I should further state that after Mrs. Gilroy's death a thorough search of her effects was made. In the lock box at the bank nothing was found but currency, but in a manila envelope in her trunk in her room the paper dated November 24, 1935, was found, folded,—I should say, laid on top of and folded with a letter from Joseph M. Hurt, Jr., dated February 19, 1934, and then these two papers placed within the folds of the typewritten document in the legal back of Joseph M. Hurt, Jr., Attorney, that was the unexecuted will of John Gilroy.

"After the suggestion by Miss O'Brien that there was a later will a second, and even more thorough, search of the effects of Mrs. Gilroy was made, but no other testamentary paper of any kind was found.

"The statute requires that, unless properly witnessed, a will must be wholly in the handwriting of the testator and signed by him. The question to be here resolved is whether, by the proper application of principles of law and under proper construction of the statute of wills, the court should ignore the additions, embellishments and deletions made on the paper by the hand of Agnes O'Brien in the way and under the circumstances mentioned.

"The word 'wholly' is a strong word; but words in law are rarely, if ever, given their absolute and utter meaning, as in the sciences or in mathematics. A number of illustrations might be given but the whole idea is summed up in the Latin maxim which we may translate freely: 'the law pays no attention to very small matters.'

"Let me approach this discussion from the weakest addendum to a holograph will. If 'wholly' is to be given its utter meaning then you must not use water marked paper; and I observe that, by chance, the sheet of paper on which this document is written is watermarked 'Knights of Columbus.' There at the outset is something upon this document that prevents it from being 'wholly' in the handwriting of Mrs. Gilroy, in the utter and absolute sense of the word. But that is rather farfetched.

"We observe, however, that printed at the top of this paper is a device in the nature of a coat of arms with K of C in it; and then the printed words: 'Knights of Columbus, Richmond Council No. 395, Richmond, Virginia, Meetings First and Third Mondays, 810 East Grace Street.' Those printed words are on this document; yet nobody would think for a moment that they would in a legal sense, prevent the document from being 'wholly' in the handwriting of Mrs. Gilroy.

"Already we have gone far enough to demonstrate that 'wholly' is not used in the Virginia statute in its absolute, utter and rigidly uncompromising sense.

"I need not go far afield to sustain the point: In *Triplett* v. *Triplett*, 161 Va. 906, 172 S. E. 162, there were on the document the signatures of at least two subscribing witness. Those signatures of course were not in the handwriting of Dr. Triplett. Without any discussion, indeed without allusion to the fact that these addenda were upon the document and by other hands, the Court declared the paper a good holograph will. This demonstrates that the word 'wholly' as used in the statute does not mean 100%. Words in law rarely mean 100%.

"Let me go further: My holograph will is required to be 'wholly' *in my handwriting*. Until 1919 the expression was 'wholly written by the testator.' It was changed by the Revisors to read 'wholly in the handwriting' because a typewritten will might be 'wholly written by the testator'; and

it was not intended that a will typewritten or printed by the testator should be a good holograph.

"I take my holograph will. I am not certain about the legibility of some words, so on the margin I undertake, myself, with my pen *to print* the correct spelling of those words. Though done by me these addenda are not in my 'handwriting'; I printed them. Would any one suggest the document not be probated on this account? Or, if I go into the body, recognizing the infirmity of my handwriting, and print over some handwritten words their proper spelling, would it be suggested that this is not a good will because not wholly in my handwriting? I cannot think the document as a holograph will would be vitiated by any of these addenda. Or, if I run the document in a typewriter and, either in the margin or in the body, where I mistrust the ability of the reader to read, I type the correct spelling, do I vitiate the will? I cannot think so.

"A step further: If I take my holograph will out of the safe and say to my secretary: 'You are used to my handwriting but I sometimes write so both you and I have difficulty. In half a dozen places in this will words do not seem quite legible. I want you to run that in the typewriter and in the margin, or on top of the words, spell the words out correctly in type.' I do not think this would vitiate my holograph will.

"And one more, and final, illustration: A foreigner residing here writes his holographic will in his own language, French, for instance. It is of course good. For convenience he has a friend typewrite the equivalent English *between the lines*. My opinion is that the will as written in French remains a good holograph will, the translation being ignored for probate purposes.

"My opinion that the addenda I have somewhat laboriously pointed out, not in the handwriting of the testator, do not prevent the probate court from admitting to probate the part of the document that is 'wholly in the handwriting of the testator,' is based upon the recognition that

the safeguards of our statute of wills are designed to prevent forgery and imposition; they are not designed to make the execution of wills a mere trap and pitfall, and their probate a mere game. It is not my disposition to relax at all the requirements of the statute, but merely to do what we do freely in the matter of construction and other fields of law,—give the statute a sound and fair construction and rigidly insist upon substantial compliance with its requirements. As was said in *Moon* v. *Norvell*, 184 Va. 842, 849, 36 S. E. (2d) 632:

> "The purpose of the statute, in prescribing formalities for the execution of wills, is to prevent mistakes, imposition, fraud or deception. 'The ceremonies required by this law, were not intended to restrain or abridge the power of testators, but to guard and protect them in the exercise of that power; and in that spirit (as I think) should be administered.' *Boyd* v. *Cook*, 3 Leigh (30 Va.) 32, 50."

"The changes made in the will in the instant case, in the presence of the unlettered testatrix and with her consent, do not change her meaning or alter her plain testamentary intent one jot or tittle. In deciding this case, if I could stop here, I would hold that these changes by another hand, made under the circumstances and with the intent disclosed by the evidence, are immaterial and de minimis; and just as much to be ignored as the watermarks on the paper or printed lettering at the top of the sheet.

"I am not permitted, however, to stop here. Agnes O'Brien has testified that there was in existence a subsequent will, holograph and signed, which started out with a revocation clause, following which was a disposition of identical purport and effect as the paper now before the court. The question, therefore, confronts the court whether, even if the view is taken that the interpolations of Miss O'Brien would not vitiate the paper of November 24, 1935, the

testimony as to the revocation by a subsequent will must not be held to work a revocation of the paper now before the court.

"Except for some little points of differentiation and subsequent events, I should be almost bound by the case of *Hugo* v. *Clark*, 125 Va. 126, 99 S. E. 521, wherein there was testimony of two reliable witnesses that they had seen a later will expressly revoking the will under consideration; and these witnesses further undertook to say what the provisions of that will were throughout. The court held that the express revocation would revoke the will in dispute; and sent the case back for a new trial, instructing the court below to let the jury hear the evidence 'as to the contents of the second will.' This sounds as if the court had in mind that the later will was to be set up; but that was a probate proceeding, as this is, and not a suit in equity to set up a lost will.

"But two years later, and after two jury trials below, under the reverse style of *Clark* v. *Hugo*, 130 Va. 99, 107 S. E. 730, the case was again before the Court of Appeals. It appeared that since the first appeal there had been one trial resulting in a verdict for the will, which the trial court had set aside, and another trial (which was the third), resulting in a verdict against the will, which the trial court had set aside. The Court of Appeals again reversed, and, indicating its entire satisfaction with the will, entered up final judgment probating the earlier will, despite the clause of express revocation in the lost subsequent will.

"It seems to me that in the two intervening years a notable change had come over the approach, and the conclusions as well, of the Court of Appeals. They had come to recognize, as they indicate on page 108 of 130 Va., the momentous consequences of placing every will at the mercy of parol testimony of a stranger that it had been revoked by some document that had disappeared.

"So I feel I am not bound by anything that was said in *Hugo* v. *Clark*, 125 Va. 126, 99 S. E. 521. But there is

another and more satisfying doctrine that I shall allude to now namely, the doctrine of dependent relative revocation.

"Now the court is not permitted in this proceeding to follow Agnes O'Brien's testimony throughout and to its ultimate conclusion. If so followed there could and would be set up a subsequent will of the same purport and to the same effect as the will now before the court. For two reasons I cannot do that: *first*, this can be done only in a suit in equity brought for the purpose of setting up the lost will and then probating it. This is not that kind of a proceeding. And, *second*, I cannot do this because there is only one witness to indicate that there was a subsequent will and the testimony of that witness lacks the cogent force and convincing quality that a court requires to set up a lost instrument.

"The Court is asked by the contestant to accept the testimony of Agnes O'Brien that there was a later will beginning with a clause of revocation. The court is asked to rip this introductory clause of the supposed subsequent will out of its setting, and use it to cancel this 1935 will; but without going further and undertaking to set up, here or elsewhere, the whole of the subsequent will.

"But I am satisfied that I should apply the doctrine of dependent relative revocation in this situation. The doctrine is a narrow one, perhaps of rare applicability, but it is well established and recognized. It is briefly and clearly set out in 57 Am. Jur., Wills, Section 514 *et seq.* It is this: if the testator cancels or destroys a will, or does any other act to vitiate it, with the present intention of making a new one immediately, and the new will is not made, or if made fails of effect because not properly executed, or for any other reason, then the old will, having been conditionally revoked, still stands. The law takes the view that if the testator is not able to carry out his whole testamentary intent in making the new will, or in making changes in the old one, then it is to be presumed that he prefers

his old will to intestacy; that the revocation was conditioned upon the new testamentary disposition being effective.

"The doctrine is nowhere more clearly recognized than in *Barksdale* v. *Barksdale*, 12 Leigh (39 Va.) 535, where probate of a will dated June 4, 1838, was resisted upon the ground that it had been expressly revoked by an instrument dated November 2, 1839, purporting to be a subsequent will, but invalid as such because there was only one subscribing witness. The statute as it then stood permitted revocation of a will by a simple unattested declaration in writing; and there was such a declaration embodied in the instrument of November 2, 1839.

" 'The question was, whether the clause of revocation in the instrument of the 2nd of November, 1839, could be abstracted from the instrument, so as to operate as a revocation.' (p. 538).

"It seems that the question there was the same as the question here,—upon the phase of the instant case now under consideration. The subsequent paper there was inoperative because not executed with the required formalities. The subsequent paper here—if in fact it ever existed, which is doubtful—is inoperative because it is not found and cannot be set up.

"The decision of the court, announced in an able opinion by Judge Baldwin concurred in by Judges Stanard, Brooke and Cabell, there being no dissent, was that the declaration of revocation could not be ripped out of the ineffective subsequent will so as to revoke the earlier will; and the earlier will was admitted to probate. No later Virginia case that I know of has modified the authority of the case, or questioned the soundness of the principles upon which it was decided,—unless the apparent ignoring of the principles in the first decision of *Hugo* v. *Clark*, 125 Va. 126, 99 S.E. 521, be considered *contra*; but see *Clark* v. *Hugo*, 130 Va. 99, 107 S. E. 730, in which the same revoking instrument was not given effect. Neither of these two opinions cites the *Barksdale Case*.

"In the *Barksdale Case* Judge Baldwin calls the doctrine under consideration 'subsidiary conditional' revocation, instead of the more modern and now accepted designation 'dependent relative revocation.' It seems to me that merely 'conditional revocation' would suffice.

"The following quotations are from *Barksdale* v. *Barksdale*, 12 Leigh (39 Va.) 535, at the pages cited:

"Page 541:

> " 'In every testamentary revocation, the testator always acts upon the supposition that his whole purpose will be accomplished, that his entire testamentary act will be effectual, as well in regard to the new disposition of the subject, as the revocation of that which he had made by the former instrument; and his revocation is in fact part and parcel of his new testamentary action. * *'

"Page 543:

> " 'Now, though a regard to those provisions is perfectly proper, when we treat them and the revocation as one entire testamentary act, to stand or fall together, how can it be proper when we look to the revocation as separate and distinct, and of substantive and independent force and efficacy?'

"Page 543:

> " 'In my view of the subject, this being a question of express revocation, it would be wholly immaterial, whether the provisions of the will of 1839 were consistent or inconsistent with the provisions of the will of 1838. If the former, then the testator could have had no design to abrogate the first will until the last was made effectual: if the latter, then his only purpose must have been to make a change of or amongst the

objects of his testamentary bounty. In neither case could it have been his intention to die intestate, which would be the direct result of tearing the revocatory parenthesis from the inanimate paper of 1839, and giving it distinct vitality. Besides, no man, I should think, ever made provision by last will and testament for dying intestate. If such had been the testator's design, he would have torn up the will of 1838 or thrown it into the fire, or if out of his possession and control, would have simply executed a naked instrument of revocation.'

"And what could come closer to the instant case than this that now follows?—

"Pages 546, 547:

" 'The case of *Onions* v. *Tyrer*, 1 P. Wms. 343, was like the one last mentioned in all respects, except that it was made stronger by the circumstance, that the first will was cancelled by the testator, under the impression that the second was made effectual, which cancelling was therefore treated as merely conditional. The decision of Lord Cowper was in accordance with the doctrine above stated, though he dwelt upon the circumstance, existing also as he said in the case of *Eggleston* v. *Speke*, that the devises in both wills were substantially the same, but expressing the opinion that the effect would be the same, to the exclusion of the heir at law, though the devise in the second will had been to a third person.'

"Applying these principles to the instant case, it is clear that these slight, and as I consider them immaterial, changes made in the paper of November 25, 1935, were made for one or the other of these two purposes, and no other, namely: *First*, merely to polish and clarify and make intelligible, without changing the meaning; or, *second*, as a basis to be used by the testatrix in making a new will, which new will she then proposed to make immediately. It is

in the second view that this doctrine of dependent relative revocation is particularly applicable.

"There is a dearth of authority upon changes of this particular kind. Such cases seem to be very rare. Undoubtedly the strongest in favor of the contention of the contestant is *In re Towle's Estate*, 14 Cal. (2d) 261, 93 P. (2d) 555, reported and annotated in 124 A. L. R. 624. The California law is similar indeed to the Virginia law. However, in the will there concerned the subsequent changes, made in the presence of and with the consent of the testatrix by a bank official, were of a more substantial nature than we have in the instant case. Here, indeed, as I have said, the changes are wholly insignificant and do not alter the meaning at all. Also California has a statute making statutory the holding of its own Court in *In re De Caccia's Estate*, 205 Cal. 719, 273 P. 552, 61 A. L. R. 393; which statute provides that no address, date or other matter written, printed or stamped upon the document that is not incorporated in the provisions which are in the handwriting of the decedent shall be considered as any part of the will. This statute expressly protects from watermarks, letter heads and the like; but it has a further impact, under the rule of *expressio unius*, that anything, however trivial, that is incorporated and not in the handwriting vitiates the will. It may well be that Virginia, having no such statute, may be at liberty to take a more liberal view of trivial changes than California could do under its somewhat hidebound statute; and perhaps the Virginia Court will not have to say, as the California Court said on page 632 of the A. L. R. report, that:

> " 'the slightest change by a stranger with the knowledge and consent of the testator, at any time during its existence, will completely vitiate any instrument as a holographic will.'

"That is the California doctrine laid down by its highest court. I have already given examples to show that it is my

opinion that it is not the Virginia doctrine. This court is not bound by the case *In re Towle* and I decline to follow it. I prefer to follow cases taking the contrary view in almost identical situations, such as *Toebbe* v. *Williams*, 80 Ky. 661; and particularly *McMichael* v. *Bankston*, 24 La. Ann. 451, where another hand had inserted the word 'to' and the word 'acres.' Under the California law, which I have just quoted, that would have vitiated the Louisiana will, but the Louisiana Court said there, and I say here:

> " 'We cannot say that the law requires a will to be annulled for so unimportant and trivial cause.'

"An order probating the holograph will as originally written by the testatrix will be prepared and entered, which order will make this opinion a part of the record."

*Appeal refused.*