PRESENT:  All the Justices

TAMARA MOWBRAY BERRY

v.  Record No. 051161   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                    March 3, 2006
ESTHER MADDOX TRIBLE, ET AL.


              FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
                    Burke F. McCahill, Judge


     In this appeal, we consider whether the circuit court erred
in confirming a jury verdict that a handwritten phrase and
notation, made on a typewritten draft of a will containing many
other handwritten entries, constituted a valid holographic will.

     This issue arises out of a will contest between a niece and
a sister of the decedent, Louise Trible St. Martin (Louise).
Tamara Mowbray Berry (Tamara), Louise's niece, claimed that an
attested document executed in 1993 (the 1993 will), which
ultimately resulted in Tamara being the executor and sole
beneficiary of Louise's estate, was Louise's last will and
testament.  Louise's sister, Esther Maddox Trible (Esther),
asserted that Louise had executed a holographic will in 1997
leaving her entire estate to Esther.  The alleged holographic
will began with a handwritten phrase, "I Give and bequeath all,"
which appeared near the top of one page of a seven-page
typewritten draft of a will drawn by Louise's attorney (the 1997
document).  This phrase purportedly was connected by an arrow to

the handwritten notation "Esther Maddox Trible" near the middle of the same page and signed "Louise Trible St. Martin" at the bottom of that page. Esther argued that the combined words, "I Give and bequeath all [arrow] Esther Maddox Trible [signed] Louise Trible St. Martin," was Louise's last will and testament.

Louise died in March 2002. A few months later, Tamara submitted the 1993 will for probate in the circuit court. Esther, in turn, filed a bill of complaint to establish a lost will, presenting a facsimile copy of the single page of the 1997 document described above. This copy has been reproduced and is appended to this opinion.

By agreement of the parties, the circuit court consolidated the probate and lost will issues for trial. The court granted Esther's request for a jury trial on the issues arising under the court's probate jurisdiction. The court also ordered that the lost will issues would be submitted to the jury as an issue out of chancery under the court's equity jurisdiction. Additionally, the court appointed a guardian ad litem to represent the interests of Louise's nephew, Mark Trible, a minor child who had a potential interest in the estate.

Before trial, the circuit court held that the 1993 will was executed in compliance with the statute of wills, Code § 64.1-

2

The court accordingly awarded Tamara partial summary judgment on her probate petition.[1]

At trial, the evidence showed that in her 1993 will, Louise left her entire estate to her husband, Robert Louis St. Martin (Robert), and if he predeceased her, to Tamara.  Robert died in June 1997.

For many years, Louise had enjoyed a close relationship with Tamara that began during Tamara's childhood.  After Robert's death, Tamara visited Louise often, helping her care for her pets and delivering groceries and medications to her.

Tamara grew worried about Louise's health and became concerned about her behavior, which Tamara considered "erratic." Louise and Tamara had several bitter arguments concerning Louise's ability to care for herself, which caused their personal relationship to deteriorate.  Louise later confronted Tamara and told her to stop involving herself in Louise's affairs.

In September 1997, Louise became ill and was admitted to a hospital.  While in the hospital, Louise telephoned her lawyer, Mildred F. Slater, who had prepared Louise's 1993 will.  Louise informed Slater that Robert had passed away and asked Slater to draft a new will.  According to Slater, Louise stated that she

---

[1] Esther does not challenge the circuit court's holding that the 1993 document met the requirements for a valid attested will.

wanted to leave her entire estate to Esther and, if Esther predeceased Louise, to have her estate divided among all Louise's nieces and nephews. Slater also testified that Louise said she wanted Tamara stricken from the will. Slater prepared the requested document and sent a facsimile copy of the typewritten draft will to Louise's attending nurse at the hospital.

A few weeks later, Louise's nurse sent Slater a facsimile copy of the typewritten draft that had been altered to include several handwritten changes and additions on each page. The facsimile copy Slater received was missing a page from Slater's original draft. Additionally, section headings were renumbered and pages were rearranged.

The handwritten portions of the document were in both printed and cursive form. The handwritten entries included stricken portions of typewritten text, additions, and arrows apparently connecting some of the handwritten notations to parts of the typewritten draft. Louise's living nieces and nephews, including Tamara, also were listed in the handwritten entries. Additionally, the portion of the document naming Slater as Louise's executor was struck, and Esther's name was handwritten in its place. Further, at the bottom of each page appeared the signature, "Louise Trible St. Martin."

The greatest number of handwritten changes in the reorganized document appeared on page seven, which originally was the second page of the typewritten draft prepared by Slater. At the top of that page were the handwritten words, "Article # Two." Printed beneath and to the right of that notation was the phrase "I Give and bequeath all." Under the "d" in the word "and" was the tip of an arrow. The tail of the arrow was about an inch lower and ended both next to the handwritten words "Esther Maddox Trible" and immediately above the first letter of the typed phrase that began "my property, real and personal, tangible and intangible . . . ."

There were other handwritten changes made to this page of the document. A provision leaving tangible personal property to Irene Trible, the former wife of one of Louise's nephews, was struck. The handwritten phrase "want everything sold at auction" was written next to a typed sentence of the draft describing the disposition of Louise's estate should Esther predecease Louise. Addresses of nieces and nephews were written in the margins and connected to typed portions of the document by numerous arrows.

Because Slater had difficulty reading the handwritten entries on the document transmitted to her, she contacted Louise by telephone and also wrote her a letter asking for her assistance in making the corrections so that the will could be

5

redrafted and executed. Louise refused to allow Slater to make any changes to the document during their conversation and did not respond to Slater's letter. Slater had no further contact with Louise.

Louise's relationship with Tamara deteriorated further after Louise was released from the hospital. In September 1999, Tamara accepted a job transfer and moved with her family to North Carolina. Tamara and Louise stayed in occasional contact but never saw each other again.

After Louise's death, some friends and family members, including Esther and Tamara, went to Louise's home to help clean the house, which was in complete disarray. Despite a thorough search of the home, they did not find either the 1993 will or the 1997 document.

Because a will could not be located, Esther asked Marshall National Bank to serve as the administrator of Louise's estate. The Bank qualified as administrator and sent a trust officer to Louise's home to search for evidence of Louise's assets. While examining boxes containing Louise's papers, the trust officer found an envelope containing the original 1993 will. Although the original 1997 document was not found, Esther eventually obtained the facsimile copy from Slater, who had retained it among her records.

At the conclusion of the evidence, Tamara moved to strike Esther's evidence arguing, among other things, that the 1997 document was not a valid will but merely a draft document that had been edited by Louise and returned to her attorney. The circuit court denied Tamara's motion and submitted the case to the jury.

The jury was asked to decide two questions. First, the jury was asked whether the handwritten phrase, "I Give and bequeath all [arrow] Esther Maddox Trible [signed] Louise Trible St. Martin," was Louise's will. In response, the jury found that this handwriting on the 1997 document was Louise's will. Second, the jury was asked to determine whether Louise later revoked the 1997 writing. On this question, the jury found that Louise did not revoke the 1997 writing.[2]

The circuit court entered a decree in accordance with both these verdicts and further held the 1993 will is "revoked to the extent that the 1997 will is inconsistent therewith." Additionally, the court concluded that Tamara and Esther should

---

[2] The circuit court previously had ruled that the first question would be submitted to the jury for a verdict under the court's probate jurisdiction, while the second question would be considered by the jury as an issue out of chancery under the court's equity jurisdiction. Based on our holding in this appeal, however, we do not reach the issue whether the court erred in placing the different issues before the jury in this manner.

each be responsible for paying one-half the fees of the guardian ad litem and entered a decree reflecting this determination.

Tamara filed a motion to set aside the verdict, again arguing that the 1997 document was not a valid will but was merely an edited document containing handwriting that could not be understood apart from the typewritten language. The circuit court denied Tamara's motion.

Tamara appeals from the circuit court's final decree that the selected handwriting from the 1997 document was a valid will. Esther assigns cross-error to the court's holding requiring her to pay one-half the fees of the guardian ad litem.

Tamara argues that the handwritten phrase, "I Give and bequeath all [arrow] Esther Maddox Trible [signed] Louise Trible St. Martin," proffered by Esther as Louise's last will and testament, does not meet the requirements for a valid holographic will. Tamara asserts that these handwritten notations cannot be fully understood without considering the typewritten text and the other substantive handwritten entries appearing on the draft.

Tamara also observes that Louise signed each page of the 1997 document, not just the page on which the proffered handwriting appears, indicating that she intended the contents of the entire document to be her will. Thus, Tamara maintains that the face of the 1997 document shows that Louise was merely

8

attempting to edit a typewritten draft, which could not qualify as a valid will because it was not wholly in Louise's handwriting and was not attested.

In response, Esther argues that the proffered handwritten phrase and notation, along with Louise's signature at the bottom of the page, constitute a valid will because they are "wholly in the handwriting of the testator and [are] complete" without need to consider the typewritten portions of the document. Esther also asserts that Louise's testamentary intent is established by the words "[g]ive" and "bequeath." Additionally, Esther contends that the "surplusage" theory of holographic wills permitted the jury and court to disregard the typewritten portions of Slater's draft will and to focus solely on the handwritten phrase proffered by Esther. We disagree with Esther's arguments.

The requirements for a holographic will are set forth in Virginia's statute of wills, Code § 64.1-49. A holographic will must be made wholly in the testator's handwriting, and two disinterested witnesses must identify the handwriting as that of the testator. Id. The testator must sign the will or have someone in her presence sign the instrument at her direction. Id. The signed name must appear on the face of the document in a manner showing that the name is intended as a signature. Id.;

9

Kidd v. Gunter, 262 Va. 442, 445, 551 S.E.2d 646, 648 (2001); Slate v. Titmus, 238 Va. 557, 560, 385 S.E.2d 590, 591 (1989).

These statutory requirements are not intended to limit the power of a testator but to protect the testator's exercise of that power. Bell v. Timmins, 190 Va. 648, 657, 58 S.E.2d 55, 60 (1950); Moon v. Norvell, 184 Va. 842, 849, 36 S.E.2d 632, 634 (1946). In establishing these requirements, the statute is designed to prevent mistakes, imposition, fraud, and deception. Id. However, the safeguards of the statute are not designed to make the execution of wills a trap for the testator. Robinson v. Ward, 239 Va. 36, 42, 387 S.E.2d 735, 738 (1990); Bell, 190 Va. at 657, 58 S.E.2d at 59. Therefore, we give the statute "a sound and fair construction" with uniform insistence on "substantial compliance" with the statutory requirements. Robinson, 239 Va. at 42, 387 S.E.2d at 738 (quoting Bell, 190 Va. at 657, 58 S.E.2d at 59-60).

A holographic will, like any will, must manifest the testator's intent of making a last and final disposition of her property. Moon, 184 Va. at 849-50, 36 S.E.2d at 635. This testamentary intent need not be expressed in formal language in the will, provided that the face of the instrument establishes such intent. Id. at 850, 36 S.E.2d at 635.

In requiring that a holographic will be "wholly in the handwriting of the testator," the General Assembly did not

10

contemplate that the word "wholly" should be applied in its absolute sense. See Bell, 190 Va. at 654, 58 S.E.2d at 58. We illustrated this point in Bell when considering a proffered will that was wholly in the testator's handwriting except for certain changes in spelling, punctuation, and phrasing that did not affect the content of the document and were made with the consent of the testator. Id. at 652, 58 S.E.2d at 57. We confirmed the will's validity, holding that alterations to a handwritten will that do not affect the substance of the will, and have no impact on the will's testamentary intent, do not invalidate a testator's holograph. Id. at 662-64, 58 S.E.2d at 62-63.

In contrast to the facts in Bell, we are presented here with a proffered holographic writing containing only a portion of the testator's handwritten entries, which were made on the face of a typewritten document. In resolving whether this selected handwritten phrase and notation constitute a valid will, we find that our decision in Moon is particularly instructive. There, the testator wrote a holographic will on the reverse side of a typewritten will that had been superseded by another duly attested will. The testator struck through all the printed material in the body of the superseded typewritten will except for an article dealing with payment of funeral expenses and debts. Moon, 184 Va. at 846-47, 36 S.E.2d at 633-

34. On the reverse side of this former will, the testator wrote in her own hand another will.

We held that the presence of typewritten material on paper used to draft a holographic instrument does not destroy the effect of the holographic instrument as a will, provided that the typewritten material is not part of the handwritten instrument and is not referenced directly or indirectly in the handwritten instrument. Id. at 850-51, 36 S.E.2d at 635. We confirmed the holographic entries as the testator's last will and disregarded the typewritten material on the other side of the document in its entirety. We noted that in the holographic entries, the testator disposed of her entire estate and named the parties and the amount of property she wanted each to receive. We held that her writing left no uncertainty concerning her "dispositive intentions." Id. at 849, 36 S.E.2d at 635.

In further support of our holding, we observed that the handwritten manuscript was not interwoven with the typewritten language and did not directly follow the typewriting, but appeared on the reverse side of the typewritten document. Id. at 851, 36 S.E.2d at 635-36. We also noted that the content of the handwritten instrument did not suggest that it was a continuation of any portion of the typewritten document. Id. at 852, 36 S.E.2d at 636.

12

In two other decisions, we confirmed the validity of holographic instruments that consisted of only a few words followed by a signature.  In Grimes v. Crouch, 175 Va. 126, 129, 7 S.E.2d 115, 116 (1940), the deceased wrote in his own hand, "Ever thing left to sister for life times."  His signature appeared immediately below this text.

In Gooch v. Gooch, 134 Va. 21, 29, 113 S.E. 873, 876 (1922), we confirmed a decree admitting to probate a codicil written in the deceased's handwriting and signed by him directly below the following handwritten words: "My will is made in favor of my wife, Loulie M. Gooch . . . ."  This handwritten entry appeared on a printed will form provided by the decedent's fraternal organization.[3]  Id. at 25-27, 113 S.E. at 874-75.

Although these handwritten entries in Grimes and Gooch were very brief, they constituted all the handwriting of the testator that appeared on the documents under review.  Further, the handwritten language was self-contained and could be understood without reference to the typewritten text.  Thus, our holdings

---

[3] We note that the assignments of error in Gooch did not challenge the determination made at trial that these printed portions of the form could be disregarded.  Thus, the effect of that unrelated printed material was not discussed in our holding.  See 134 Va. at 29, 113 S.E. at 876.  The assignments of error in Gooch also did not challenge the admission at trial of an attestation clause to probate that was not wholly in the testator's handwriting.  134 Va. at 30, 113 S.E. at 876.  Nevertheless, in dictum, we stated that the admission of this clause was harmless error because the handwriting of the testator was "complete and entire in itself."  Id.

that these holographic entries were valid instruments in and of themselves did not result from the exclusion of any other handwritten entries made by the testator.

We also have confirmed the validity of a holographic will written on the reverse side of a hardware store receipt.  In that case, Bailey v. Kerns, 246 Va. 158, 160-63, 431 S.E.2d 312, 313-15 (1993), the printed material on the receipt was not a factor in our analysis of the proffered will because the content of the receipt bore no relationship to the handwritten entries, which we considered in their entirety.

Two fundamental principles characterize our holdings regarding the holographic wills approved in the above decisions. First, in each of those decisions, we considered all the holographic entries made by the testator, rather than only selected portions of those writings advanced by the will's proponent.  Second, as exemplified by our analysis in Moon, we were not required to consider the printed material on those documents as part of the will because the handwritten entries were "not interwoven with the typewriting," and did not continue from the typewriting in physical form, by reference, or in sequence of thought.  184 Va. at 851-52, 36 S.E.2d at 635-36.

These distinctions are critical to our analysis of the present case.  Here, Esther asks us to disregard many of Louise's substantive handwritten entries that are plainly

14

related to the typewritten text.  At the top of the page on which the proffered holograph appears, Louise wrote "Article # Two," thereby suggesting that both the handwritten and typewritten material below were part of a larger document. On that same page, Louise connected to the typewritten text, by lines and arrows, other handwriting supplementing the substantive typewritten provisions for contingent beneficiaries, as well as a direction that she "want[ed] everything sold at auction."

We also observe that the three portions of text that form the proffered holographic will are selected from three separate locations on the one page.  Louise's signature, however, appears at the bottom of that page, which contains other substantive portions of handwritten and typewritten text.  Thus, we perceive no basis for concluding that Louise intended that her signature on this page apply only to the isolated phrase propounded by Esther.

Esther also asks us to disregard the five other pages of typewritten text that Louise returned to Mildred Slater.  We are unable to do so, however, because Louise signed the bottom of each page and made substantive changes to the typewritten text on several of those pages.  Louise's signature at the bottom of each page also leaves unresolved whether she intended that her signatures validate all the typed and handwritten material

15

appearing above each signature, or whether she intended that the signatures merely verify her changes to the document that she contemplated her attorney would redraft.  In addition, Louise's signature at the end of the document, which appears immediately after a typewritten reference to a will "consisting of seven (7) typewritten pages," is not consistent with Esther's contention that the proffered holograph alone was Louise's last will.

Acceptance of Esther's argument would require us to discard the two principles discussed above that have guided so many of our decisions on holographic wills.  We are unwilling to do so and, instead, take this opportunity to reaffirm those basic principles.

We hold that a holographic will may only be established upon consideration of all handwritten entries made by the testator on a document, not upon consideration of only portions of those handwritten entries selected by the will's proponent. We articulate this principle because a contrary conclusion would allow a proponent to select only those portions of handwriting favorable to her position, effectively permitting the proponent to rewrite the will.  We further hold that a purported holographic will is invalid if the handwritten entries are interwoven with or joined to the typewritten material on the document, or continue from the typewritten material in physical

16

form, by reference, or in sequence of thought.  See Moon, 184 Va. at 851-52, 36 S.E.2d at 635-36.

Applying these principles, we conclude that the proffered holographic will fails as a matter of law because Louise's handwritten language considered as a whole is not self-contained such that it can be understood without reference to the typewritten text.  Rather, that handwritten language is interwoven with the text, both physically and in sequence of thought, throughout the document.

Our conclusion is not altered by Esther's contention that the entries she did not proffer as part of the will may be disregarded as mere "surplusage."  The "surplusage" theory generally is limited to the striking of typewritten material, when the remaining portion of an instrument that is handwritten has meaning standing alone.  See In re Estate of Teubert, 298 S.E.2d 456, 459-60 (W. Va. 1982); see also 2 Page on the Law of Wills (rev. 2003) § 20.5 at 279-80 ("the surplusage test [requires that] the non-holographic material [be] stricken and the remainder of the instrument admitted to probate if the remaining provisions made sense standing alone").  Here, however, Esther mistakenly asks that we apply this theory to numerous handwritten, as well as typewritten, entries.  Moreover, we are unable to apply the theory to disregard the typewritten entries that Esther seeks to exclude from

17

consideration because, in the absence of the typewritten text, Louise's handwritten entries are either ambiguous or fragmented and unintelligible.

Accordingly, we consider the entire document that Louise returned to Mildred Slater and conclude that the document was not a valid will because it was neither wholly in Louise's handwriting nor duly attested by two competent witnesses. See Code § 64.1-49. We therefore hold that the circuit court erred in confirming the jury verdict that the selected portions of Louise's handwritten entries were a valid will.[4]

Finally, we address Esther's assignment of cross-error that the circuit court erred in ordering her to pay one-half the fee of the guardian ad litem. Esther argues that because she prevailed on the merits of the case placed before the jury, the court abused its discretion in failing to require that Tamara pay the guardian ad litem's entire fee. We do not consider this argument further, however, because Esther's reliance on her former status as a substantially prevailing party now fails in light of the different conclusion we have reached regarding the merits of the case.

For these reasons, we will reverse that part of the circuit court's decree holding that the proffered portion of the 1997

---

[4] In view of our holding that the 1997 document was not a will, we need not consider Tamara's remaining assignments of error.

document was Louise's last will.  We will affirm that part of the circuit court's decree holding that the 1993 will was a valid, attested will, affirm the court's apportionment of the fees of the guardian ad litem, and enter final judgment for Tamara admitting the 1993 will to probate.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and final judgment</u>.

*Article #TWO*

*I give and bequeath All* → *PJMT's wocken 21835 A-dobe TOO U.C.H. Bluegrass VA 89571*

**ARTICLE THREE**

I give and bequeath all my ~~Paddock Cocoper~~ property, including but not limited to my jewelry and rings, to ~~IRENE TRIBLE~~ of 21835 Adobe, Tod U.C.F.M., Reno, Nevada 89511. *ESTHER MADDOX TRIBLE*

**ARTICLE FOUR**

All the rest, residue ~~and remainder~~ of my property, real and personal, tangible and intangible, wheresoever situate and howsoever held, herein referred to as my Residuary Estate, I give, devise and bequeath to my sister, ~~MARY~~ *ESTHER* MADDOX TRIBLE, of 1033 Amarillo Avenue, Palo Alto, California 94303, if she survives me.,

*PST's Address HCR BOX 6 BlueGRASS VA 24413*

*wont everything all at Auction*

In the event my sister, ~~ESTER~~ *ESTHER* MADDOX TRIBLE of 1033 Amarillo Avenue, Palo ~~Alto~~ *Alto*, California 94303 shall predecease me, I give, devise and bequeath all the rest, residue and remainder of my property, real and personal, tangible and intangible, wheresoever situate and howsoever held, herein referred to as my Residuary Estate, ~~in the following shares:~~ *to THE following names* *Jorgensen UCSON TUCSON*

(i) To my nephew, PAUL JORGENSEN, of 1750 West Chardonnay Drive, ~~Reno~~ ~~per centum (5%) of said net proceeds.~~ *TUSCAN AZ*

(ii) To my nephew, PAUL SEWARD TRIBLE, JR., son of Paul S. Trible, of Deleplane, Virginia, ~~per centum of said net estate.~~ *meredith AZ* *meredith (Deceased)*

(iii) To my nephew, PAUL SEWARD TRIBLE, son of John Trible, of ~~Monterey County~~, Virginia, ~~per centum of said net proceeds.~~

(iv) To my nephew, *(JOHN MICHAEL TRIBLE)*, of Reno, Nevada 89511, ~~per centum of said net proceeds.~~ *brother of John Sr. Jr.*

(v) To my niece, MARY ~~Schlossmacker~~ *STINSON Sacres* ~~per percentum of said net~~ *deceased* ~~proceeds.~~ *St. Paul MN*

*MARY FLEEGEL STINSON*

(vi) To my niece, LOUISE SCHLOSSMACKER, of Minneapolis, Minnesota 55401, ~~per centum of said net proceeds.~~

(vii) To my niece, LINDA *Trible* ~~Schloss~~ *Fleegel* of *brother John Emeredith Trible*

*TRIBLE Fleegel* ~~TRIBLE~~

LOUISE M. ST. MARTIN

*11920 Zebalon Shores Littleton MN 5534*

*3504 PILGRAM LANE PlyMOUTH MN 5441*

*LOUISE 99753*

*Schlossmacker ST. PAUL MN*

*Louise Trible St Martin*