# Richmond

EDITH J. POINDEXTER v. J. HENDLEY JONES, ET AL.

GEORGE L. DOVEL, ET AL. v. J. HENDLEY JONES, ET AL.

December 1, 1958.

Record Nos. 4842, 4843.

Present, Eggleston, C. J., and Spratley, Buchanan, Miller, Snead and I'Anson, JJ.

The opinion states the case.

*Glenn W. Ruebush* (*K. C. Moore*, on brief), for appellant, Edith J. Poindexter.

*Sam P. Conrad, E. Eugene Luther* and *Henry C. Clark*, for appellees, J. Hendley Jones, et al.

*Sam P. Conrad*, for appellants, George L. Dovel, et al.

*E. Eugene Luther, Henry C. Clark* and *Glenn W. Ruebush* (*K. C. Moore; Clark & Wilson*, on brief), for appellees, J. Hendley Jones, et al.

MILLER, J., delivered the opinion of the court.

On May 13, 1956, Maude R. Snyder died, and on December 20, 1956, the clerk of the circuit court admitted to probate two holographic writings dated respectively March 8, 1938, and March 27, 1939, as the last will and testament of Maude R. Snyder, deceased.

Edith J. Poindexter is beneficiary under these two testamentary papers and for identification they are hereinafter referred to at times as the 1938 and 1939 wills.

On May 29, 1957, George L. Dovel, Olin A. Dovel and others, some of the heirs and distributees of Maude R. Snyder appealed from the order of probate and asserted that two cancelled holographic writings executed by Maude R. Snyder and dated respectively October 3, 1947, and August 9, 1950, impliedly revoked the will probated by the clerk and that decedent had died intestate. Though the two writings of 1947 and 1950 had been cancelled by the maker *animus*

*revocandi* by tearing off her signature and could not be probated as wills, yet it is not denied that they had been written wholly in the handwritting of Maude R. Snyder and signed by her, and that she then possessed testamentary capacity.

When the appeal from the probate order of December 20, 1956, was heard by the court, J. Hendley Jones, a nephew of decedent (one of decedent's heirs and distributees who appealed from the clerk's order of probate) tendered to the court another holographic paper writing dated August 20, 1953, and moved for its probate as Maude R. Snyder's last will. It is as follows:

"Harrisonburg Va.

August 20, 1953

"I give all that I possess to my beloved nephew Hendley Jones

"Maude R. Snyder"

The admission to probate of this holographic writing, which, if it be a valid will, leaves all of decedent's estate to J. Hendley Jones, was opposed by Edith J. Poindexter and other interested parties on the grounds that it was not a testamentary document and that Maude R. Snyder lacked testamentary capacity at the time it was executed. The court concluded that the writing was testamentary and that the maker possessed testamentary capacity when she executed it. The clerk's order of probate was set aside and the writing of August 20, 1953, admitted to probate as Maude R. Snyder's last will.

For an understanding of the import of the five holographic writings, it may be said that the 1938 and 1939 instruments, when taken together, left the whole of the maker's estate to Edith J. Poindexter, with the exception of directing that she "put monuments to my parents and my grave." The 1947 and 1950 wills left monetary bequests to numerous persons and to a church. In some instances the same donees were named as legatees in both wills but were bequeathed lesser monetary sums in the 1950 than in the 1947 will. Both the 1947 and 1950 wills named Edith J. Poindexter as beneficiary of the residuum.

Edith J. Poindexter was granted an appeal from the final order of probate, and George L. Dovel, Olin A. Dovel, and other heirs and distributees of decedent were also awarded an appeal.

There are several assignments of error presented in the two petitions for appeal but they may be consolidated and stated thus:

Edith J. Poindexter asserts that the court erred when it held that (a) the writing of August 20, 1953, was testamentary in character,

and (b) Maude R. Snyder possessed testamentary capacity when she excuted that document. She contends that the 1938 and 1939 writings constitute decedent's last will and testament.

George L. Dovel, Olin A. Dovel, and other heirs and distributees of decedent (other than J. Hendley Jones), likewise assert that the court erred when it probated the writing dated August 20, 1953, for the reasons assigned by Edith J. Poindexter. They, however, also assign as error the court's failure to hold that the 1938 and 1939 wills were revoked by implication by the inconsistent holographic and testamentary documents of 1947 and 1950 when they were executed, and that Maude R. Snyder, having revoked these latter instruments, died intestate.

Edith J. Poindexter meets this contention by asserting that the 1947 and 1950 instruments were only prospective or potential wills but never became operative in any manner because a will speaks only at the maker's death, *Spinks* v. *Rice*, 187 Va. 730, 47 S. E. 2d 424, 20 M. J. Wills, § 2, and these documents were cancelled and destroyed by the maker *animus revocandi*. Finally she asserts that neither the 1947 nor the 1950 will was wholly in conflict with the 1938 and 1939 wills, and in any event, they could have only partially revoked the 1938 and 1939 wills.

The first question to be determined is whether or not the writing of August 20, 1953, is testamentary in character.

There is much testimony in the record tending to show the circumstances preceding and surrounding execution of the writing of August 20, 1953. It consists of conversations, statements and acts of Maude R. Snyder and others. Some of it is to the effect that the instrument was intended by the writer as a testamentary disposition of her property, but much tends to prove that it was never intended by its maker to be a will.

As the paper lacks on its face any indicia of *animus testandi*, evidence *aliunde* to prove that it was a will should not have been admitted.

If evidence that the writing was testamentary in character had appeared upon its face, then opponents might have offered proof that it had never been intended by its maker to be a will; that she did not execute it with testamentary intent. For example, if a law professor in teaching the subject of wills and merely intending to instruct his class on how a simple holographic will might be executed, wrote in his handwriting a brief paper devising and bequeathing his

property to a named person, signed it, and then died, but never intended it to be operative as a testamentary instrument though it carried indicia of testamentary intent, his heirs and distributees might offer evidence to show the true circumstances under which it was executed. In such a case, if evidence of lack of testamentary intent were offered to disprove *animus testandi*, then proponents of the will would be at liberty to offer evidence that tended to show that it was, in fact, executed *animus testandi*. As the example paper carried on its face indicia of *animus testandi*, it was entitled to be offered for probate as a testamentary instrument. Here the instrument of August 20, 1953, lacks on its face any evidence of testamentary intent and proof *aliunde*, either for or against that instrument, was inadmissible. Testamentary intent must appear within the four corners of the instrument, and lacking that necessary indicia, it cannot be rightly probated.

This principle is treated by Judge Brockenbrough Lamb in his recent book, *Virginia Probate Practice, 1957*. There in § 33, page 66, under the heading, "Testamentary Nature of the Instrument," it is stated:

"In order to be probated as a will the paper must be of a testamentary character. A paper may be testamentary without being dispositive; a codicil changing the executor or adding a co-executor is testamentary but not dispositive.

"The word 'testamentary' in this connection may be taken to mean applicable or related to death; having to do with dispositions or arrangements effective upon the happening of that event. It is sometimes defined as connoting intent to make a will—*animus testandi*. * * *"

Then, after indicating misgivings with the holdings in some cases, notably *Henderson v. Henderson*, 183 Va. 663, 33 S. E. 2d 181, the learned author and recognized authority on probate practice uses this unequivocal and emphatic language at page 67:

"At any rate it is just as important that *animus testandi* appear—*and appear from the face of the paper itself*, unaided by evidence *aliunde* —as that the formalities of execution required by the statute of wills be complied with.

"That the language of the will on its face must show that it is related to death clearly appears from what that Court of Appeals said in *Smith v. Smith*, 112 Va. 205. There the language of the paper offered for probate was 'Every thing is Lous'—Lou being the writer's

wife. This language was considered more appropriate to indicate a gift *in praesenti;* no relation to death being indicated the paper was held to be not testamentary in character and probate was denied.

"The point under discussion could hardly be better clarified and illustrated than by comparing the language of the paper in *Smith* v. *Smith, supra,* which was held not to indicate that the paper was testamentary, with the language under consideration in the later case of *Grimes* v. *Crouch,* 175 Va. 126, where the paper offered for probate as a will was 'Ever thing left to sister for life times' (*sic*).

"The court recognized and emphasized the settled doctrine that there must be indicia of testamentary intent *on the face of the paper;* and proceeded to find such indicia in the connotation of the word 'left', saying on page 132 that 'the word "left" is of testamentary significance and in that sense is in common use', citing Century Dictionary, the Bible and an earlier Virginia case (but the quotation from the case, *Carr* v. *Effinger,* 78 Va. 197, appears rather to confuse than clarify). The paper was admitted to probate as a will.

"The distinction thus clearly made between the paper in *Smith* v. *Smith, supra,* and the paper in *Grimes* v. *Crouch, supra,* is satisfying and illuminating and may well serve as a landmark: *It must appear from the face of the paper that it is testamentary in character.*"

There is some conflict in decisions of the various states on the question, but the modern and better view is in keeping with the principle as announced by Judge Lamb. In 57 Am. Jur., Wills, § 874, p. 580, it is said:

"The trend of modern authority is in support of the view that where there is nothing in an instrument to indicate a testamentary intention, extrinsic evidence is not admissible to secure probate of the instrument by showing that it was intended to take effect as a will. \* \* \*"

Further discussion as to admissibility of evidence *aliunde* to prove or disprove testamentary intent is found in 57 Am. Jur., Wills, §§ 13 and 890.

Neither the word "give" nor the word "beloved", as used by Maude R. Snyder in this writing discloses *animus testandi.* Webster's *New International Dictionary,* 2d ed., among other definitions of the word "give", lists the following: "to make over or bestow without receiving a return; to confer without compensation; \* \* \* to make over or yield possession of by way of exchange; \* \* \* to hand

or hand over; * * * to bestow freely or fully * * *." It thus appears that the word "give" usually implies an immediate delivery of possession.

The word "beloved" is defined in the same authority as "loved; greatly loved; dear to the heart." It is self-evident that this word carries no testamentary significance but is merely a term of endearment.

In context, when considered alone or together, or along with the entire instrument, the two words, "give" and "beloved" have no relation to death nor do they indicate testamentary intent.

The decision of *Carr* v. *Effinger*, 78 Va. 197, relied upon by J. Hendley Jones, in which the word "leave", as there used by the testator, was said to mean the same thing as the word "give," is easily distinguishable from the case at bar. The document under consideration was concededly a will, and the court was undertaking to determine what character of estate passed to testator's wife under the following paragraph:

"What money and bonds I have in Possession, or judgments due me, I leave unto my beloved wife, to be collected should she think it best and invested in confederate bonds or loaned out at interest."

Appellant, Samuel D. Carr, successor in interest to testator's wife, claimed that she took an absolute estate in the property bequeathed by that paragraph, and appellees asserted that the otherwise clear effect of the language of that paragraph was limited by another paragraph in the will.

In construing the quoted paragraph and the other language in the will, the court was not deciding whether the instrument was a will but what character of estate passed. Her estate was declared to be absolute, and in so holding the court said:

"This conclusion is irresistible if we but reflect that the very comprehensive word 'leave' used in a will, is used only to signify the *disposing* intention of the testator with respect to his property—his estate; that, so employed, the meaning is the exact equivalent and imports the same as if the language had been, 'I leave by this my will, or I give by this my will, to my beloved wife, etc.' The words 'leave' and 'give', especially when used in a will without qualifying or restraining words, are interchangeable terms and mean one and the same thing." At page 203.

The question of whether or not the word "give" indicated testamentary intent was not the issue decided.

The indicia of testamentary intent must be found in the paper itself, and evidence *aliunde* to supply this vital and necessary characteristic is not permitted.

Having decided that the writing of August 20, 1953, is not a will, we are relieved of the necessity of deciding whether or not the maker possessed testamentary capacity when she executed that document.

We must now determine whether or not the 1938 and 1939 wills were revoked by the 1947 and the 1950 wills when either or both of the latter papers were executed, and if so, did their ultimate destruction by Maude R. Snyder, *animus revocandi*, revive the 1938 and 1939 wills?

Sections 64-59 and 64-60, Code 1950, are pertinent to the questions presented. They follow:

"§ 64-59. No will or codicil, or any part thereof, shall be revoked, unless under the preceding section[1], or by a subsequent will·or codicil, or by some writing declaring an intention to revoke the same, executed in the manner in which a will is required to be executed, or by the testator, or some person in his presence and by his direction, cutting, tearing, burning, obliterating, canceling or destroying the same, or the signature thereto, with intent to revoke."

"§ 64-60. No will or codicil, or any part thereof, which shall be in any manner revoked, shall, after being revoked, be revived otherwise than by the re-execution thereof, or by a codicil executed in the manner hereinbefore required, and then only to the extent to which an intention to revive the same is shown."

It is not denied that the 1947 and 1950 wills were properly executed and thereafter revoked by testatrix by tearing off her signatures in accordance with the terms imposed by § 64-59. What effect do these cancelled or dead wills have upon the 1938 and 1939 wills?

We need not stop to consider whether or not the 1950 will is wholly inconsistent with the 1947 will, and did, when executed, or would, when probated, have impliedly revoked the 1947 will because of inconsistency. Both were destroyed *animus revocandi*, but when executed, it is certain that each or both were intended to dispose of testatrix's entire estate, and if unrevoked at her death, the two would

---

[1] Section 64-58 repealed by Acts 1956, ch. 65.

have unquestionably accomplished that object. As it is, the two together are wholly inconsistent with the 1938 and 1939 wills, and if unrevoked would have supplanted those prior wills and devised and bequeathed Maude R. Snyder's entire estate. 57 Am. Jur., Wills, § 474, p. 331.

It is pertinent to observe that neither the 1947 nor the 1950 will contained a revoking clause, nor did either *"declare an intention to revoke"* any previous wills. In fact, it is not claimed by the heirs and distributees that either the 1947 or 1950 document constitutes a "writing declaring an intention to revoke * * * executed in the manner in which a will is required to be executed * * *." Thus there is no revocation of the 1938 and 1939 wills under that specific provision of § 64-59.

Edith J. Poindexter earnestly insists that all wills and codicils are ambulatory instruments and inoperative until death. *Spinks* v. *Rice, supra;* 20 M. J., Wills, § 2, p. 134; 57 Am. Jur., Wills, § 15, p. 48. She then argues that neither the 1947 nor the 1950 instrument consituted "a subsequent will or codicil" because they were not operative at the death of testatrix. As testatrix destroyed both *animus revocandi,* appellant insists that in the nature of things, they could not measure up to "a will or codicil" within the intent of § 64-59.

Appellant heirs and distributees rely upon *Rudisill's Executor* v. *Rodes,* 29 Gratt. (70 Va.) 147, but in that case the latter instrument contained a revoking clause; it was a writing "declaring an intention to revoke * * *."

There John Rudisill made and published successively three wills, dated January 22, 1868, February 14, 1871, and the third or last will in April or May, 1872. The second will contained a clause revoking all former wills, and the last or third contained a similar clause. The last will was destroyed by testator *animus revocandi,* leaving the other two wills intact when he died. The opinion says that the single question presented was "whether by the destruction of the third and last will, the second was revived." Solution of the question was declared to depend upon the construction of section 9, chapter 118, Code 1873, which has not been altered and is in the identical language of § 64-60. It is then stated by the court that this section was first enacted in the revision of the laws in the year 1849 and was almost a literal copy of the first clause of the English Statute of Wills, 7 Will. IV and I Vic. ch. 26 (July 3, 1837), found in 2 Jarman on Wills (1st American edition) 751, and construed in 1843 in *Major*

*and Mundy* v. *Williams and Iles,* 3 Curteis 432 (7 Eng. Eccl. R. 453). The court concluded by holding that the writing offered for probate as John Rudisill's last will and testament, dated February 14, 1871, had been revoked by the subsequent will executed in April or May, 1872, and was not revived by destruction *animus revocandi* of the 1872 will. See also *Hugo* v. *Clark,* 125 Va. 126, 99 S.E. 521.

It is to be noted that in the *Rudisill* case the third will *declared an intention* to revoke, and the court directed its attention to section 9, chapter 118, Code 1873, now § 64-60, which has to do with the "revival of wills after revocation." It did not even comment upon section 8, chapter 118, Code 1873, now § 64-59, which has to do with "revocation of wills generally," and is equally pertinent to the precise question presented as is § 64-60. That is true because unless the subsequent will *revoked* the former when executed, the issue of whether or not there is a revival is never reached. The court seems to have treated the second will of February 14, 1871, as being concededly revoked upon execution of the third will in 1872, which *contained a revoking clause* and directed its attention solely to the question of whether destruction of the third will *revived* the second will. Nor did the court refer to *Barksdale* v. *Barksdale,* 12 Leigh (39 Va.) 551, which casts light upon the question of whether or not there was ever a revocation if the latter instrument is not operative at death.

In *Clark* v. *Hugo,* 130 Va. 99, 107 S. E. 730 (here cited solely on the point indicated, for otherwise it has been impaired by the more recent decision of *Bell* v. *Timmins,* 190 Va. 648, 58 S. E. 2d 55), the court, in evidencing its acquiescence in the principle announced in *Rudisill's Executor* v. *Rodes, supra,* said:

"The legal rules and principles which must control our decision are clear. A will is revoked by a subsequent *inconsistent will;* and after such revocation the destruction of the latter will does not have the effect of reviving the former, even though the testator so intends. Code 1919, sec. 5234; *Rudisill* v. *Rodes,* 29 Gratt. (70 Va.) 147. * * *" At page 106. (Emphasis added.)

It is of moment to observe that the court not only by that statement indicated adherence to the principle announced in *Rudisill* v. *Rodes, supra,* but by dictum extended that doctrine to include a subsequent will which had been destroyed *animus revocandi,* and only impliedly revoked the former will because of inconsistency. There for the

second time, it also fails to mention § 5233, now § 64-59, upon which revocation is dependent.

The different doctrines obtaining in various jurisdictions are collected and discussed at some·length in the case styled *In re Gould's Will*, 72 Vt. 316, 47 A. 1082. In the course of the court's discussion, it is said at page 318, "There is a diversity in the decisions of the American courts upon this subject which is partly due to statutory requirements. *Rudisill's Executor* v. *Rodes*, 29 Gratt. 47 [sic], was decided under a statute that required a revival of a revoked will to be made by a republication or by a codicil. In some jurisdictions the rule is, without a statutory requirement, that revocation of a subsequent will does not *ipso facto* revive a former only expressly or impliedly revoked by the latter. * * *"

Discussion of the conflicting views obtaining in different jurisdictions is also found in 1 Page, *Wills*, Lifetime ed., §§ 470, 475 and 476.

In 28 A. L. R. 911 in an annotation under the heading of "Revocation of later will as reviving earlier will," the following comment is found at page 918:

"Some statutes substantially provide for this rule. Rudisill v. Rodes (1877) 29 Gratt. (Va.) 147. The Virginia statute provides that no will or codicil or any part thereof, which shall be in any manner revoked, shall, after being revoked, be revived otherwise than by the re-execution thereof, or by a codicil executed in the manner hereinbefore required, and then only to the extent to which an intention to revive the same is shown. Under this statute it is held that a prior will is not revived by the destruction animo revocandi of a subsequent will containing an express revocatory clause, although such was the intention of the testator,·where he did not re-execute the former will. Rudisill v. Rodes (Va.) supra. This case is followed in Clark v. Hugo (1921) 130 Va. 99, 107 S. E. 730." Additional discussion of this subject is found in 162 A.L.R. 1072, 51 A.L.R. 653, ftn. 2, and 59 A.L.R. 2d 53.

Of persuasive effect is *Barksdale* v. *Barksdale*, 12 Leigh (39 Va.) 551. There the testator, William Barksdale, executed a holographic will on June 4, 1838, in which he bequeathed $30,000 to Frances P. Barksdale, $5,000 to Susan Stott, and to his father, William Jones Barksdale, all the "rest and residue of my estate." Thereafter on November 2, 1839, he executed another written instrument purporting to be a will in which, after stating he was "revoking all other

wills and testaments which I may have previously made," he bequeathed $5,000 to Thomas Y. Tabb and the residue of his estate, real and personal, to his father, William Jones Barksdale.

It is conceded that the writing of November 2, 1839, was not executed with the solemnities required and is ineffectual as a will but it is insisted by William Jones Barksdale that it is a valid written revocation of the former will. At that time the section of the Code which is not identical with, but corresponds with present § 64-59, was section 9, ch. 104, p. 377, 1 Rev. Code 1819, which reads as follows: "No will in writing, or any devise therein, of chattels, shall be revoked by a subsequent will, codicil, or declaration, unless the same be in writing."

In holding that the instrument of November 2, 1839, did not revoke testator's former will, Judge Baldwin said:

"There are two modes of written revocation contemplated by the law just quoted, one by a will or codicil in writing, the other by a declaration in writing. For the sake of distinction, the first may be called a testamentary revocation, and the last a declaratory revocation. It is true, the declaratory revocation may assume the shape of a last will and testament; but that is mere matter of form, if the paper be not also testamentary in its nature. The distinction between the two modes of revocation is not formal, but essential. In the testamentary revocation, the testator contemplates a new disposition of his property, and the revocation may be implied from inconsistency in the provisions of the two instruments, in which case it is a matter of comparison and construction; or it may be express, in order that the testator may do his new testamentary work without being in any wise fettered by the contents of his former will. The declaratory revocation, on the other hand, is always express, is not a matter of comparison and construction, and is in contemplation by the testator of that disposition of his property made by the law governing in cases of intestacy. (At page 556.)

\*     \*     \*     \*     \*     \*     \*

"Besides, no man, I should think, ever made provision by last will and testament for dying intestate. If such had been the testator's design, he would have torn up the will of 1838 or thrown it into the fire, or if out of his possession and control, would have simply executed a naked instrument of revocation." (At page 559.)

Indeed, for one to meet the Grim Reaper with an intact will in

his hand, which conflicts with no testamentary instrument then in existence, is, to say the least, a paradoxical approach to an intestate demise.

A former will is not revoked in whole or in part by a later inconsistent will unless there is, in fact, such conflict between the two as to necessarily have the effect of supplanting the former by the latter, in whole or in part, *Bradshaw* v. *Bangley*, 194 Va. 794, 75 S. E. 2d 609, and thus preclude the former from operating as a will upon the subject matter at the death of the maker. If one has been destroyed by the maker *animus revocandi*, then no conflict arises or can arise between the two instruments, for wills are ambulatory and operate only upon and by reason of death. *Spinks* v. *Rice*, *supra*, and 57 Am. Jur., Wills, § 15, p. 48.

*Conflict* of the 1938 and 1939 wills with the 1947 and 1950 wills is the sole ground and basis on which the latter are claimed to have revoked the former under the provision in § 64-59. But, as there can, in fact, be no conflict between these *ambulatory instruments—these wills—until death*, and as the latter were destroyed *animus revocandi*, they thus never constituted wills under § 64-59, and never revoked the 1938 and 1939 wills. So much of the opinion in *Clark* v. *Hugo*, *supra*, as is in conflict with this holding is overruled.

For the reasons stated, it necessarily follows that probate of the writing of August 20, 1953, must be vacated, and the wills of 1938 and 1939 held to have been unrevoked and rightly probated by the clerk. The judgment order of the trial court appealed from will be reversed, and the case remanded for such further proceedings as may be proper, not inconsistent with the view herein expressed.

*Reversed and remanded.*